Stuart A. Krause
Bryan D. Leinbach
Zeichner Ellman & Krause LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400
skrause@zeklaw.com
bleinbach@zeklaw.com

*Attorneys for Citibank, N.A. and Citibank, N.A. as Administrative Agent and Collateral Agent*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITIBANK, N.A., and CITIBANK, N.A., as Administrative Agent and Collateral Agent,<br><br>          Plaintiff,<br><br>  - against -<br><br>DOUGLAS JACOBSEN and NORMAN J. KRAVETZ,<br><br>          Defendants. | Civil Action No.:<br><br><br>**COMPLAINT** |

Plaintiffs Citibank, N.A. ("Lender") and Citibank, N.A., as Administrative Agent and Collateral Agent ("Agent"), by their attorneys Zeichner Ellman & Krause LLP, for their Complaint against defendants Douglas Jacobsen and Norman J. Kravetz, allege, upon information and belief, as follows:

**Nature of Action**

1. This is an action for breach of certain Limited Indemnity Guaranties executed as of December 28, 2017 by each of the defendants in favor of Lender and Agent (the "Guaranties"), guaranteeing, among other things, payment of obligations under a certain Credit Agreement dated as of June 29, 2017 (the "Credit Agreement"), as amended.

2.      Lender and Agent made a $50,000,000.00 business loan to corporate borrower parties the defendants controlled, pursuant to the Credit Agreement, as amended.  To induce Lender and Agent to enter into an amendment to the Credit Agreement, defendants entered into the Guaranties, which provide for the payment by defendants of the loan upon the occurrence of a "Guaranty Tigger Event."

3.      Approximately a year later, the borrower parties defaulted on their obligations under the Credit Agreement (including full payment at maturity), by among other things failing to make required payments under the Credit Agreement and failing to meet their obligations under other loan agreements.  Moreover, defendants' obligations to repay the loan as provided in the Guaranties were triggered due to, among other things, borrower parties' fraud in connection with a related loan, the borrower parties' inability to pay their debts as they became due, and the borrower parties' failures to comply with certain positive and negative covenants in the Credit Agreement and related loan documents.  Defendants have failed to satisfy their obligations under the Guaranties despite multiple demands.  As a result, Lender and Agent seek payment in this action under the Guaranties.

## Parties and Related Entities

4.      Plaintiff, in each of its respective capacities, is a national banking association with its main office as designated in its articles of association in the state of South Dakota.  It is the Initial Lender (and only lender) under the Credit Agreement.  In addition, it is the Administrative Agent and Collateral Agent under the Credit Agreement.

5.      Upon information and belief, defendant Douglas Jacobsen ("Jacobsen") is an individual domiciled in the state of California.  Jacobsen is the co-founder and Chief Executive

Officer of JH Capital Group Holdings, LLC.  Jacobsen is also the founder and Chief Executive Officer of JH Portfolio Debt Equities, LLC.  Upon information and belief, Jacobsen exercised and/or exercises control over certain of the Borrower Parties (defined below).

6.      Upon information and belief, defendant Norman J. Kravetz ("Kravetz") is an individual domiciled in the state of California.  Kravetz is the co-founder and Chairman of the Board of JH Capital Group Holdings, LLC.

7.      Upon information and belief, non-party JHCG Holdings LLC ("Borrower") is a Delaware limited liability company.  Borrower also has active business registrations in California and Georgia.

8.      Upon information and belief, Borrower's sole equity member is JH Capital Group Holdings, LLC ("Parent").  In turn, Parent's sole member is Jacobsen Credit Holdings LLC, whose sole member is Jacobsen.

9.      Upon information and belief, non-party JH Portfolio Debt Equities, LLC ("Servicer"), is a California limited liability company.  Servicer also has active business registrations in Delaware, Arizona, Hawaii, Illinois, and Missouri.

10.      Upon information and belief, Servicer's sole member is Borrower.

11.      Borrower, Servicer, Parent, and their Affiliates (defined below) are in the business of purchasing portfolios of consumer and merchant loan obligations at a discount off the face value of such loans and generating profits by deploying a proprietary collections platform and network of collection agencies to professionally manage the recovery of the amounts due on the accounts.

**Jurisdiction and Venue**

12.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1332(a) and 1348 because plaintiffs and defendants are citizens of different states, and the matter in controversy exceeds $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over the defendants because, among other things, in each of the Guaranties, defendants submitted themselves and their property to the jurisdiction of the United States District Court for the Southern District of New York to resolve any disputes relating to the Guaranties, and pursuant to NYGOL § 5-1402.

14.     Venue is likewise proper in this Court because defendants agreed in the Guaranties to resolve any dispute relating to the Guaranties in the United States District Court for the Southern District of New York and explicitly waived any objection they may have to the venue of such action in this Court, as well as the right to argue that this Court is an inconvenient forum.

**Facts Common to all Counts**

**The Loan**

15.     On or about June 29, 2017, Borrower and Parent entered into the Credit Agreement with Lender and Agent.  A true and correct copy of the Credit Agreement is attached hereto as **Exhibit A**.

16.     The Credit Agreement identifies Parent as Borrower's parent company.

17.     The Credit Agreement defines the Servicer as JH Portfolio Debt Equities LLC.

18.     The Credit Agreement defines Borrower as JHCG Holdings LLC.

19.     In addition, Borrower, Parent and Servicer are each defined as a "Borrower Party" under the Credit Agreement.  See Credit Agreement, p. 2 (Ex. A).  The Credit Agreement also broadly defines an "Affiliate" as

> "Affiliate" of any Person means any Person who directly or indirectly controls, is controlled by, or is under direct or indirect common control with such Person.  For purposes of this definition, the term "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling," "controlled by" and "under common control with" have meanings correlative to the foregoing.  In addition, for purposes of this definition, any fund or investment vehicle, whether existing as of the Closing Date or thereafter formed, which is managed by any Person, shall be deemed to be an "Affiliate" of such Person.  Notwithstanding the foregoing to the contrary and solely with respect to the Borrower Parties and their Subsidiaries, the term "Affiliates" means and refers only to a Person who is a direct or indirect Subsidiary of the Parent or is a Person with respect to whom the Parent directly or indirectly through one or more Subsidiaries owns at least 50% of the Equity Interests thereof.

Credit Agreement, p. 1 (Ex. A).

20.     Servicer is an Affiliate of Borrower and Parent under the definition in the Credit Agreement.  In turn, Servicer and Borrower are each Affiliates of Jacobsen and Kravetz under the definition in the Credit Agreement.

21.     Section 2.01 of the Credit Agreement provided that Lender, as the initial lender, would advance $50,000,000.00 to Borrower.  (See Ex. A).

22.     Under Section 8.01(a)(i), an "Event of Default" occurs under the Credit Agreement if there is a default:

> in the payment of (A) any interest on the Loan when the same shall become due and payable, and (B) any other amount due to the Administrative Agent, in such capacity, pursuant to the Loan Documents, when the same becomes due and payable, in each case which default continues for a period of two (2) Business Days following the earlier of knowledge of, or written notice to the Borrower;

Credit Agreement, § 8.01(a)(i) (Ex. A).

23.     Under Section 8.01(a)(ii), an "Event of Default" occurs under the Credit Agreement if there is a default:

> in the payment of the outstanding principal balance of the Loan (and any accrued and unpaid interest thereon, including accrued but uncapitalized PIK Interest) on the Maturity Date;

Credit Agreement, § 8.01(a)(ii) (Ex. A).  The Credit Agreement further defines the Maturity Date under the Credit Agreement as the earlier to occur of (a) the stated maturity date of June 29, 2018, (b) the day on which the Loan shall have been declared or otherwise become due and payable following an Event of Default pursuant to Section 8.02 of the Credit Agreement, or (c) a change of control of Borrower. Credit Agreement, pp. 10,15 (Ex. A).

24.     Under Section 8.01(a)(v), an "Event of Default" occurs under the Credit Agreement if:

> an Insolvency Event with respect to any Borrower Party or any Affiliate shall have occurred;

Credit Agreement, § 8.01(a)(v) (Ex. A).  "Insolvency Event" is broadly defined in the Credit

Agreement to mean, among other things, that a person is "unable to pay its debts as they become

due." Credit Agreement, p. 7.

        25.    Under Section 8.01(a)(xi), an "Event of Default" occurs under the Credit

Agreement if:

> (A) any default or breach occurs, which is not cured within any applicable grace period or waived, in the payment of any amount with respect to any Indebtedness (other than the Obligations) of any Borrower Party or any Subsidiary of a Borrower Party for borrowed money having an aggregate principal amount in excess of $500,000 individually or in the aggregate; or (B) any default or breach occurs, which is not cured within any applicable grace period or waived, in the performance, observance or fulfillment of any covenant contained in any agreement, contract, document or instrument to which any Borrower Party or any Subsidiary of a Borrower Party is a party or to which any of their properties or assets are subject or bound (x) under or pursuant to which any Indebtedness having an aggregate principal amount in excess of $500,000 individually or in the aggregate was issued, created, assumed, guaranteed or secured and such covenant default or breach continues for more than any applicable grace period and permits the holder of any such Indebtedness to accelerate the maturity thereof, or (y) that is between any Borrower Party or any Subsidiary of a Borrower Party, on the one hand, and any Lender or Affiliate of any Lender on the other hand (other than the Loan Documents); or (C) any Indebtedness of a Borrower Party or any Subsidiary of a Borrower Party for borrowed money having an aggregate principal amount in excess of $500,000 individually or in the aggregate is declared to be due and payable or is required to be prepaid (other than by a regularly scheduled payment or a payment due on the voluntary termination of a capital lease) prior to the stated maturity thereof, or there occurs any event which would cause any such obligation to become, or allow any such obligation to be declared, due and payable;

"Indebtedness" is broadly defined in the Credit Agreement to include any "indebtedness or liability

of such Person for borrowed money," "obligations issued or for liabilities incurred on the account

of such Person," and "obligations of others secured by any lien on property or assets of such Person." Credit Agreement, p. 6 (Ex. A).

26.     Pursuant to Section 8.03(a) of the Credit Agreement, Lender (and any subsequent lenders or participants) irrevocably appoints Agent its agent and authorizes Agent "to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto." "Loan Documents" is defined to include the Credit Agreement.  Credit Agreement, p. 9 (Ex. A).  Agent is authorized to enforce the Credit Agreement and to bring this action.

27.     As provided in the Credit Agreement, $50,000,000.00 in credit was extended to Borrower by Lender.

## The First Amendment

28.     On or about December 28, 2017, Borrower and Parent entered into a First Amendment to the Credit Agreement with Lender and Agent (the "First Amendment").  A true and correct copy of the First Amendment without exhibits is attached hereto as **Exhibit B**.

## The Guaranties

29.     To induce Lender and Agent to enter into the First Amendment, Jacobsen and Kravetz each executed and delivered the Guaranties to Lender and Agent.  True and correct copies of the Guaranties are attached hereto as **Exhibits C** and **D**.

30.     Pursuant to the Guaranties, Jacobsen and Kravetz each absolutely, irrevocably and unconditionally guarantee the "due and punctual payment and performance of the Guaranteed Obligations (other than the Originator Receivables Obligations) upon the occurrence

of a "Guaranty Trigger Event." The Guaranties define "Guaranteed Obligations" to include "all

Obligations of Borrower to Lender and Agent under the Credit Agreement." Guaranties, §§ 1, 2.

31.     Each of the Guaranties defines a Guaranty Trigger Event to include the

following events:

(iii)   fraud or intentional misrepresentation by any officer,
        employee, agent or representative of the Borrower or its
        Affiliates in connection with the transactions contemplated by
        the Transaction Documents, or in respect of the Collateral or
        any Underlying Portfolio;

                                ***

(x)     any violation by Borrower or Parent of Section 7.01(a),
        7.01(u), 7.01(w), of [sic] Section 7.02 of the Credit
        Agreement;

                                ***

(xv)    an Insolvency Event with respect to Borrower, Guarantor, the
        Servicer, any Senior Borrower or any of their Affiliates;

Guaranties, § 1(iii), (x), (xv) (Exs. C, D).

32.     Each of the Guaranties states that it is "an absolute, unconditional and

continuing guaranty of payment and performance of all Guaranteed Obligations." Each of the

Guaranties further explicitly states that the obligations under the Guaranty are irrevocable. See

Guaranty, § 3(a) (Exs. C, D).

33.     The Guaranties further provide that no act or thing is needed to occur to

establish liability on the obligations guaranteed under the Guaranties. Further, no act or thing,

except full payment, discharge and performance of all Guaranteed Obligations shall in any way

exonerate the Guaranties or modify, reduce, limit or release the liability of Guarantors under their

Guaranties.  See Guaranty, § 3(b) (Exs. C, D).

34.    The Lender and/or Agent are not required to look first to the Borrower or

any person before pursuing collection under the Guaranties.  See Guaranty, § 3(b) (Exs. C, D). The

Guaranties further provide:

> Section 4.  Continuation and Validity of Guaranteed Obligations.
> The liability of the Guarantor shall not be affected or impaired by
> any of the following events: (a) the validity, enforceability,
> discharge, disaffirmance, settlement or compromise (by any Person,
> including any trustee in bankruptcy or other similar official) of the
> Guaranteed Obligations or of the Loan Documents, (b) the absence
> of any attempt to collect the Guaranteed Obligations from the
> Borrower or any guarantor or other Person, (c) the waiver or consent
> by the Lender, the Agent, or any other Person with respect to any
> provision of any instrument or agreement evidencing the
> Guaranteed Obligations, any delay or lack of diligence in the
> enforcement of the Guaranteed Obligations, or any failure to
> institute proceedings, file a claim, give any required notices or
> otherwise protect the Guaranteed Obligations other than the
> obligations sought to be enforced, (d) any change of the time,
> manner or place of payment or performance, or any other term of
> any of the Guaranteed Obligations, (e) any law, regulation or order
> of any jurisdiction affecting any term of any of the Guaranteed
> Obligations or rights of the Lender or the Agent with respect thereto,
> (f) the failure by the Agent to take any steps to perfect and maintain
> perfected its interest in the Collateral or any security or collateral
> related to the Guaranteed Obligations, (g) the commencement of any
> bankruptcy, insolvency or similar proceeding with respect to the
> Borrower or any other Affiliate of the Borrower, (h) any full or
> partial release of, compromise or settlement with, or agreement not
> to sue, the Borrower or any guarantor or other person liable in
> respect of any Guaranteed Obligations, (i) any release, surrender,
> cancellation or other discharge of any evidence of the Guaranteed
> Obligations or the acceptance of any instrument in renewal or
> substitution thereof, (j) any collection, sale, lease or disposition of,
> or any other enforcement of or realization on, any Collateral, (k) any
> assignment, pledge or other transfer of the Guaranteed Obligations
> or any evidence thereof, (l) any acceptance of collateral security,
> guarantors, accommodation parties or sureties for any or all
> Guaranteed Obligations, (m) any change in the existing relationship

between the Guarantor and the Borrower, including, without limitation, any sale or other transfer of the membership interest of the Borrower or (n) any legal or equitable discharge or defense of the Guarantor. The Guarantor waives any and all defenses and discharges available to a surety, guarantor or accommodation co-obligor.

Guaranties, § 4 (Exs. C, D).

35.     Each Guaranty expressly waives all defenses to enforcement, including without limitation, defenses relating to any invalidity or unenforceability of the Borrower's obligations and any defense based upon waiver, release, discharge in bankruptcy, the statute of limitations, res judicata, or statute of frauds, among others:

**Waivers**. The Guarantor waives any and all defenses, claims, setoffs and discharges of the Borrower, or any other obligor, pertaining to the Guaranteed Obligations. Without limiting the generality of the foregoing or any other provision hereof, to the fullest extent permitted by applicable law, the Guarantor hereby waives: (a) any defense arising by reason of any invalidity or unenforceability of the Borrower's obligations in respect of the Loan Documents, any manner in which the Lender or the Agent have exercised (or not exercised) any rights and remedies under the Loan Documents, or any cessation from any cause whatsoever of the liability of any obligor, guarantor or Person; (b) all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of the Loan Documents (including this Guaranty); (c) any release of any of the Collateral provided under the Security Agreement or other Loan Documents; (d) notice of any indulgences, extensions, consents or waivers given to the Borrower or any other obligor, guarantor or Person, notice of any Default or Event of Default under the Credit Agreement or default or event of default under any of the other Loan Documents or other notice of any kind whatsoever; (e) any right or claim of right to cause the Agent to proceed against the Borrower or any other obligor, guarantor or Person in any particular order, to proceed against or exhaust any collateral security held by the Lender or the Agent at any time or to pursue any other right or remedy whatsoever at any time; (f) any requirement of diligence or promptness on the Lender's or the Agent's part in (x) making any claim or demand on or commencing suit against the Borrower or any

11

other obligor, guarantor or Person, and (y) otherwise enforcing the Lender's or the Agent's rights in respect of the Credit Agreement or the other Loan Documents; (g) any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, usury, illegality or unenforceability which may be available to any person liable in respect of any Guaranteed Obligations, or any setoff available against, the Lender or the Agent to the Borrower or any other such person, whether or not on account of a related transaction; and (h) any duty of the Lender or the Agent to advise the Guarantor of any information known to the Lender or the Agent regarding the financial condition of the Borrower or any other circumstance, it being agreed that the Guarantor assumes responsibility for being and keeping informed of such condition or any such circumstance.

Without limiting the generality of the foregoing, to the fullest extent permitted by applicable law, the Guarantor specifically waives all defenses the Guarantor may have based upon any election of remedies by the Lender or the Agent which destroys the Guarantor's rights to proceed against the Borrower or any other obligor, guarantor or Person for reimbursement, contribution or otherwise, including any loss of rights that it may suffer by reason of any rights, powers, remedies or defenses of the Borrower in connection with any laws limiting, qualifying or discharging indebtedness of or remedies against the Borrower, and the Guarantor hereby agrees not to exercise or pursue, so long as any of the Guaranteed Obligations remain unsatisfied, any right to reimbursement, subrogation, or contribution from the Borrower in respect of payments hereunder.

Guarantor additionally waives, to the fullest extent permitted by applicable law, without limiting any other waiver or provision contained in this Guaranty, all rights and benefits which might otherwise be available to it under Sections 2809, 2810, 2815, 2819, 2821, 2839, 2845, 2848, 2849, 2850, 2899, and 3433 of the California Civil Code. Guarantor hereby waives any right to revoke this Guaranty, and acknowledges that this Guaranty is continuing in nature and applies to the Guaranteed Obligations, whether existing now or in the future.

Guaranties, § 7 (Exs. C, D). Further, each Guarantor expressly represents that the waivers set forth in the Guaranty are made with the Guarantor's full knowledge of its significance and consequences:

**Significance of Waivers**. The Guarantor represents, warrants and agrees that each of the waivers set forth herein are made with the Guarantor's full knowledge of its significance and consequences, with the understanding that events giving rise to any defense waived may diminish, destroy or otherwise adversely affect rights which the Guarantor otherwise may have against the Borrower or any other obligor, guarantor or Person, or against collateral, and that under the circumstances the waivers are reasonable.

Guaranties, § 8 (Exs. C, D).

36.     Each Guaranty also expressly provides that the Guarantor shall pay or reimburse Lender or Agent for reasonable attorney's fees incurred in enforcing the Guaranties:

**Reimbursement**.  The Guarantor shall pay or reimburse all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Lender or the Agent in connection with the protection, defense or enforcement of the Guaranty in any litigation or bankruptcy or insolvency proceedings.

Guaranties, § 9 (Exs. C, D).

## The CIBC Bank Lawsuit

37.     On June 6, 2018, CIBC Bank USA ("CIBC") commenced an action against Servicer, as well as JH Portfolio Debt Equities 2, LLC, JH Portfolio Debt Equities 4, LLC and JH Reviver LLC in the United District Court for the Northern District of Illinois captioned *CIBC Bank USA f/k/a The Private Bank and Trust Company, as Administrative Agent v. JH Portfolio Debt Equities, LLC; JH Portfolio Debt Equities 2, LLC; JH Portfolio Debt Equities 4, LLC; and JH Reviver LLC* [Civil Action No. 18-cv-3964] (the "CIBC Complaint").

38.     Servicer is a defendant in the CIBC Complaint.  In addition, Servicer is both an Affiliate of Borrower and Parent and a Borrower Party under the relevant definitions in the

Credit Agreement.  See Credit Agreement, pp. 1-2 (Ex. A).  Moreover, Servicer is an affiliate of Jacobsen and Kravetz under the definition of Affiliate in the Credit Agreement.  See id.

39.     The CIBC Complaint alleges that Servicer and the other defendants were parties to a credit agreement dated June 29, 2017 between Servicer, the other defendants and CIBC Bank USA f/k/a/ the PrivateBank and Trust Company (the "Senior Loan Agreement").  Servicer and the other defendants are identified as "Borrowers" in the CIBC Complaint.

40.     The Senior Loan Agreement identified in the CIBC Complaint is also defined as the Senior Loan Agreement in the Credit Agreement.  In addition, the Senior Loan Agreement is referenced in each of the Guaranties.

41.     The CIBC Complaint alleges that the Senior Loan Agreement provided Servicer and the other defendants with a "revolving line of credit from which they could borrow money…in an aggregate amount not to exceed the lesser of the Aggregate Commitments (hereafter defined) and the Borrowing Base Amount (as such term is defined in the [Senior Loan Agreement]."

42.     The CIBC Complaint further alleged that Servicer and other defendants were required to provide certain information to CIBC under the Senior Loan Agreement, including: (i) to provide Borrowing Base Certificates, which "contain a calculation of the Borrowing Base Amount as of the end of the preceding month"; (ii) to provide "monthly financial statements as of the end of each month," as well as "consolidated and consolidating financial statements as of the end of such fiscal year"; (iii) to provide information with respect to the portfolios owned by Servicer and the other defendants; (iv) to provide information about dividend

distributions or similar payments made to any direct or indirect equity holders of Servicer or the other defendants.

43.     The CIBC Complaint further alleges that Servicer and the other defendants defaulted under the Senior Loan Agreement and related agreements by, among other things, providing "Borrowing Base Certificates" that "contained materially false, misleading and incorrect information." These Borrowing Base Certificates formed the basis for determining the amount that Servicer and the other defendants were able to draw down under the line of credit provided for in the Senior Loan Agreement. Based upon these allegedly materially false Certificates, the CIBC Complaint alleges that Servicer and the other defendants caused the lenders under the Senior Loan Agreement "to advance more than $80,000,000.00 above the limits set forth in" the Senior Loan Agreement. The CIBC Complaint further alleged that Servicer and the other defendants failed to provide any Borrowing Base Certificates for certain months.

44.     The CIBC Complaint also alleges that Servicer and the other defendants defaulted on the Senior Loan Agreement by failing to provide accurate information regarding the portfolios owned by Servicer and the other defendants.

45.     In addition, the CIBC Complaint alleges that Servicer and the other defendants defaulted under the Senior Loan Agreement by failing to provide CIBC or the lenders under the Senior Loan Agreement with monthly financial statements or audited financial statements for the fiscal year ending December 31, 2017.

46.     Further, the CIBC Complaint also stated that Servicer and the other defendants defaulted under the Senior Loan Agreement by failing to provide CIBC or the lenders

under the Senior Loan Agreement with information concerning dividend distributions or similar payments made to any direct or indirect equity holders of Servicer or the other defendants.

47.   Based upon the numerous "Events of Default," including the ones summarized above, CIBC claimed that Servicer and the other defendants had breached the Senior Loan Agreement and alleged a breach of contract claim against Servicer and the other defendants.

### Defaults Under the Credit Agreement

48.   After the Guaranties were executed, "Events of Default" under the Credit Agreement occurred, including several set forth below.

49.   An "Event of Default" occurred under Section 8.01(a)(xi) of the Credit Agreement because Servicer and the other defendants breached their obligations to CIBC under the Senior Loan Agreement.   Servicer is a Borrower Party under the Credit Agreement in its own right and a subsidiary of Parent, another Borrower Party.   Servicer's breaches under the Senior Loan Agreement each constitute a separate default by Servicer in the performance, observance or fulfillment of any covenant contained in any agreement or contract to which "any Borrower Party or any Subsidiary of a Borrower Party is a party," as well as the default in payment of Indebtedness in excess of $500,000.   See Credit Agreement, § 8.01(a)(xi) (Ex. A).

50.   An "Event of Default" occurred under Section 8.01(a)(v) of the Credit Agreement because Servicer and the other Borrower Parties and Affiliates were subject to an "Insolvency Event" under the Credit Agreement.   Specifically, Servicer failed and was unable to pay its debts as they came due, as evidenced by the CIBC Complaint.

51.     On June 12, 2018, Lender and Agent sent Borrower and Parent a Notice of Default and Acceleration; Demand for Payment; Reservation of Rights letter (the "Notice of Acceleration").  In the Notice, Lender and Agent exercised their right under Section 8.02 of the Credit Agreement to declare the loan provided by the Credit Agreement to be immediately due and payable.  Pursuant to this Notice of Acceleration, all amounts outstanding under the Credit Agreement and related loan documents matured and became fully due and payable on June 12, 2018.

52.     The June 12, 2018 deadline in the Notice of Acceleration constitutes a Maturity Date under Section 8.01(a)(ii) of the Credit Agreement.

53.     Despite receiving the June 12, 2018 Notice of Acceleration, Borrower and Parent failed to pay the outstanding principal balance due and owing under the Credit Agreement. As a result, Borrower and Parent defaulted under Section 8.01(a)(ii) of the Credit Agreement by failing to pay the outstanding principal balance of the loan provided under the Credit Agreement by the designated Maturity Date.  In addition, Borrower and Parent defaulted under Section 8.01(a)(i) because Borrower and Parent failed to pay their outstanding indebtedness under the Credit Agreement.

54.     In any event and regardless of any accelerated Maturity Date, the stated Maturity Date under the Credit Agreement was June 29, 2018.  Borrower and Parent failed to pay the outstanding obligations under the Credit Agreement after such stated Maturity Date and, as a result separate and additional "Events of Default" occurred under Sections 8.01(a)(i) and (ii) of the Credit Agreement.

## **Guaranty Trigger Events Under the Guaranties**

55.    In addition, Borrower's and Servicer's actions led to the occurrence of several "Guaranty Trigger Events" under the Guaranties.

56.    First, a Guaranty Trigger Event occurred pursuant to Section 1(iii) of each of the Guaranties.  In this respect, the CIBC Complaint alleges numerous instances of fraud or intentional misrepresentations by an officer, employee, agent or representative of Servicer and the other defendants in connection with transactions contemplated by the Credit Agreement, the Senior Loan Agreement and other Transaction Documents.

57.    Second, a Guaranty Trigger Event occurred pursuant to Section 1(x) of each of the Guaranties.  In this respect, Borrower and Parent:

- failed to comply with Section 7.01(u) of the Credit Agreement; and

- failed to comply with Section 7.02(p) of the Credit Agreement by violating the negative covenants set forth in Article VII of the Senior Loan Agreement.

58.    Third, a Guaranty Trigger Event occurred pursuant to Section 1(xv) of each of the Guaranties because an Insolvency Event occurred.  In this respect, Servicer was unable to pay its debts as they came due.

59.    On September 12, 2018, Lender and Agent served a Notice of Guaranty Trigger Event and Demand for Payment on Kravetz and Jacobsen (the "Guaranty Demand Letters").  Therein, Lender and Agent identified the above-referenced Guaranty Trigger Events

under the Guaranties and demanded that Jacobsen and Kravetz immediately pay all amounts outstanding with respect to the Guaranteed Obligations.

60.     On October 9, 2018, Lender and Agent sent Borrower, Parent, Servicer, Jacobsen and Kravetz a second demand letter, once again demanding payment under the Credit Agreement and the Guaranties (the "Second Demand Letter").

61.     On or about December 3, 2018, Lender and Agent sent Borrower, Parent, Jacobsen and Kravetz a Second Notice of Default and Acceleration Guaranty Trigger Event; Demand for Payment; Reservation of Rights letter, demanding payment under the Credit Agreement and the Guaranties (the "Third Demand Letter").

62.     Despite receiving the Guarantee Demand Letters, Second Demand Letter, and Third Demand Letter, Jacobsen and Kravetz failed to immediately pay all amounts outstanding with respect to the Guaranteed Obligations.

63.     To date, Jacobsen and Kravetz have failed to satisfy the Guaranteed Obligations, despite demand.

## COUNT I – BREACH OF CONTRACT

64.     Lender and Agent repeat and reallege the allegations contained in paragraphs 1 through 63.

65.     Pursuant to the Guaranties, Jacobsen and Kravetz each absolutely, irrevocably and unconditionally guaranteed the due and punctual payment and performance of the Guaranteed Obligations upon the occurrence of a Guaranty Trigger Event.

66.     The Guaranties define "Guaranteed Obligations" to include "all Obligations of Borrower to Lender and Agent under the Credit Agreement."  Guaranties, §§ 1, 2.

67.     Jacobsen and Kravetz's obligations under the Guaranties were triggered by the occurrence of Guaranty Trigger Events, including without limitation, the Guaranty Trigger Events set forth above.

68.     Likewise, Borrower, Parent, and Servicer – each a Borrower Party under the Credit Agreement – defaulted on the Credit Agreement by the occurrence of several "Events of Default," including without limitation, the defaults set forth above.

69.     Lender and Agent have performed all their obligations under the Credit Agreement.

70.     Under the Credit Agreement, the total amount of principal due and owing to Lender and Agent as of January 29, 2019 is $50,000,000.

71.     In addition, pursuant to the Credit Agreement, the total amount of accrued interest and changes due and owing to Lender and Agent as of January 29, 2019 is $8,811,490.70.

72.     By Guarantors' breach of their obligations under the Guaranties, Lender and Agent have been damaged in an amount not less than $58,811,490.70 together with all accrued and unpaid interest thereon from January 29, 2019 going forward, plus late charges, fees, collection costs and expenses.

## COUNT II – ATTORNEY'S FEES

73.     Lender and Agent repeat and reallege the allegations contained in paragraphs 1 through 72.

74.     Pursuant to Section 9 of each Guaranty, Lender and Agent are entitled to recover their attorneys' fees, court costs and expenses incurred in connection with the enforcement of the Guaranties.

## COUNT III – UNJUST ENRICHMENT

75.     Lender and Agent repeat and reallege the allegations contained in paragraphs 1 through 74.

76.     Jacobsen and Kravetz received a benefit due to the funds expended to Borrower under the Credit Agreement, as amended by the First Amendment.

77.     Jacobsen and Kravetz would be unjustly enriched if they could retain the benefits, they received because of the Credit Agreement without compensation to Lender and Agent.

78.     As a result of the foregoing, Jacobsen and Kravetz have each been unjustly enriched in an amount to be determined at trial.

WHEREFORE, Lender and Agent demand judgment against defendants Jacobsen and Kravetz as follows:

(a)     on Count I, against Jacobsen and Kravetz, in the principal sum of $50,000,000., together with all accrued and unpaid interest thereon, plus late charges, fees, collection costs and expenses;

(b)     on Count II, against Jacobsen and Kravetz, for collection costs and expenses, including reasonable attorneys' fees;

(c)     on Count III, against Jacobsen and Kravetz, in an amount to be determined at trial;

(d)     interest from the time of breach of contract as set forth herein; and

(e)     for such other and further relief as the court deems just and proper

Dated:    New York, New York
          January 31, 2019

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
    Stuart A. Krause
    Bryan D. Leinbach
    1211 Avenue of the Americas
    New York, New York 10036
    (212) 223-0400
    skrause@zeklaw.com
    bleinbach@zeklaw.com

*Attorneys for Citibank, N.A. and Citibank, N.A.
as Administrative Agent and Collateral Agent*