UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITIBANK, N.A. *and* CITIBANK, N.A.,
*as Administrative Agent and Collateral Agent*,

          Plaintiff,

- *against* -

DOUGLAS JACOBSEN *and* NORMAN J. KRAVETZ,

          Defendants.

**OPINION & ORDER**

19 Civ. 959 (ER) (JLC)

RAMOS, D.J.:

    Plaintiff Citibank N.A. ("Citibank") initiated this action on January 31, 2019.[1] (Dkt. No. 1.) On April 15, 2019, Citibank filed an amended complaint bringing claims for breach of contract, unjust enrichment, and attorneys' fees against Douglas Jacobsen and Norman J. Kravetz. (Dkt. No. 19.) In brief, this case concerns Citibank's attempts to recover from Defendants on loan payments they are alleged to have guaranteed. (*See* Dkt. No. 19.)

    Defendants moved to dismiss the claims in the Amended Complaint, and the motion was referred to Magistrate Judge James L. Cott for a report and recommendation. (Dkt. Nos. 22, 32.) Judge Cott issued his Report and Recommendation on February 18, 2020, which recommends that Defendants' motion be granted in part and denied in part. On March 3, 2020, Defendants timely filed an objection challenging certain aspects of Judge Cott's Report and Recommendation. (Dkt. No. 38.) That same day, Citibank filed a limited response to the Report and Recommendation. (Dkt. No. 37.)

    For the reasons set forth below, Judge Cott's Report and Recommendation is ADOPTED in part and MODIFIED in part, as set forth below.

---

[1] This action was initially assigned to the Honorable Deborah A. Batts. It was reassigned to the undersigned on February 20, 2020, after Judge Batts passed away.

## I. STANDARD

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). A district court reviews *de novo* those portions of the report and recommendation to which timely and specific objections are made. 28 U.S.C. § 636(b)(1)(C); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). The district court may adopt those parts of the report and recommendation to which no party has timely objected, provided no clear error is apparent from the face of the record. *Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008). The district court will also review the report and recommendation for clear error where a party's objections are "merely perfunctory responses" argued in an attempt to "engage the district court in a rehashing of the same arguments set forth in the original petition." *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) (citations and internal quotation marks omitted).

## II. FACTUAL BACKGROUND

The Court adopts the recitation of the facts as set forth in the Report and Recommendation, to which neither party has objected and which accurately reflect and summarize the allegations in the Amended Complaint. Judge Cott's summary of the facts is copied here for reference:

> The following facts, taken from Citibank's Amended Complaint, as well as from documents incorporated by reference therein, are presumed to be true for the purpose of deciding Defendants' motion.
>
> Defendants Douglas Jacobsen and Norman J. Kravetz are individuals who control nonparties JH Capital Group Holdings LLC, JHCG Holdings LLC, and JH Portfolio Debt Equities LLC. Amended Complaint dated April 15, 2019 ("Am. Compl."), Dkt. No. 19, ¶¶ 5–6. Specifically, Jacobsen and Kravetz are the co-founders of JH Capital Group Holdings LLC and serve as its Chief Executive Officer and Chairman of its Board, respectively. *Id.* JH Capital Group Holdings LLC is the sole member of JHCG Holdings LLC, which, in turn, is the sole member of JG Portfolio Debt Equities LLC. *Id.* ¶¶ 8, 10. All three corporate entities are alleged to be "in the business of purchasing portfolios of consumer

and merchant loan obligations at a discount off the face value of such loans and generating profits by deploying a proprietary collections platform and network of collection agencies to professionally manage the recovery of the amounts due on the accounts." *Id.* ¶ 11.

On June 29, 2017, JH Capital Group Holdings LLC and JHCG Holdings LLC entered into an agreement with Citibank under which Citibank made a $50 million loan to JHCG Holdings LLC. *Id.* ¶¶ 15, 21; *see also* Exh. A (Dkt. No. 19-1) (the "Credit Agreement"). The Credit Agreement identifies Citibank as lender, administrative agent, and collateral agent; JHCG Holdings LLC as borrower ("Borrower"); JH Capital Group Holdings LLC as parent ("Parent"); and JH Portfolio Debt Equities LLC as servicer ("Servicer"). *Id.* ¶¶ 16–18. The Credit Agreement designates each of Borrower, Parent, and Servicer as a borrowing party. *Id.* ¶ 19.

The Credit Agreement makes cross-references to a Senior Loan Agreement defined as the Second Amended and Restated Credit Agreement also dated June 29, 2017 among Servicer, JH Portfolio Debt Equities 2 LLC, JH Portfolio Debt Equities 4 LLC, and JH Reviver LLC as senior borrowers ("Senior Borrowers"); The PrivateBank and Trust Company as senior agent; and senior lenders as they are identified in the Senior Loan Agreement. *Id.* ¶¶ 39, 40; *see also* Credit Agreement at 14.[2] The Credit Agreement also makes cross-references to other Loan Documents, which are defined to include the Credit Agreement, the Servicing Agreement, and the Security Agreement, among others. *Id.* ¶ 26; *see also* Credit Agreement at 9.

The Credit Agreement contains three defined terms that include the term "Obligations":

- "Obligations" has the meaning assigned to such term in the Security Agreement.

- "Secured Obligations" means all amounts and obligations which the Borrower may at any time owe under the Loan Documents to, or on behalf of the Lenders and/or the Administrative Agent or Collateral Agent for the benefit of the Secured Parties (or any of them) . . . .

- "Senior Obligations" means all "Obligations" of the Senior Borrowers as defined in the Senior Loan Agreement as of the Closing Date.

---

[2] The Amended Complaint does not annex the Senior Loan Agreement, nor does it otherwise appear to be part of the record.

3

*See* Credit Agreement at 10, 13, 15.[3]

The Credit Agreement also provides the following relevant definitions as they pertain to certain events of default:

- "Maturity Date" means the earlier to occur of (a) the Stated Maturity Date [June 29, 2018], (b) the day on which the Loan shall have been declared or otherwise become due and payable following an Event of Default pursuant to Section 8.02, and (c) a Change of Control.

- "Insolvency Event" means, with respect to a specified Person, (a) such Person shall (i) be unable to pay its debts generally as they become due, (ii) file a petition under any insolvency statute, (iii) make a general assignment for the benefit of its creditors, (iv) commence a proceeding for the appointment of a receiver, trustee, liquidator or conservator of itself or of the whole or any substantial part of its property or shall otherwise be dissolved or liquidated, or (v) file a petition seeking reorganization or liquidation or similar relief under any Debtor Relief Law or any other applicable law; or (b) (i) a court of competent jurisdiction shall (A) enter an order, judgment or decree appointing a custodian, receiver, trustee, liquidator or conservator of any of such Person or the whole or any substantial part of the properties of such Person, which shall continue unstayed and in effect for a period of sixty (60) calendar days, (B) shall approve a petition filed against such Person seeking reorganization, liquidation or similar relief under the any Debtor Relief Law or any other applicable law, which is not dismissed within sixty (60) calendar days or, (C) under the provisions of any Debtor Relief Law or other applicable law, assume custody or control of Borrower, any Guarantor or Indemnitor or of the whole or any substantial part of the properties of such Person, which is not irrevocably relinquished within sixty (60) calendar days, or (ii) there is commenced against such Person any proceeding or petition seeking reorganization, liquidation or similar relief under any Debtor Relief Law or any other applicable law or statute, which (A) is not unconditionally dismissed within sixty (60) calendar days after the date of commencement, or (B) is with respect to which such Person takes any action to indicate its approval of or consent.

*See id.* at 7, 10.

On December 28, 2017, the parties executed an amendment to the Credit Agreement. Am. Comp. ¶ 28, Exh. B (the "First Amendment"). In consideration thereof, Defendants each executed a limited indemnity guaranty. *Id.* ¶ 29, Exhs. C

---

[3] The Security Agreement does not define the term "Obligations." See Declaration of Kenneth E. Lee dated May 15, 2019, in Support of Defendants' Motion to Dismiss the Amended Complaint, ¶ 3, Exh. 1 (Dkt. No. 24-1).

4

and D (the "Guaranties"). Section 2 of each of the Guaranties provides in pertinent part:

> The Guarantor hereby absolutely, irrevocably and unconditionally guarantees for the benefit of the Lender and the Agents (a) the due and punctual payment and performance of the Guaranteed Obligations . . . upon the occurrence of a Guaranty Trigger Event . . . .

*See* Guaranties at 3.

Each of the Guaranties defines "Guaranteed Obligations" as the following:

> collectively, (a) all Obligations of Borrower to Lender and Agent under the Credit Agreement and other Loan Documents, and (b) all Original Receivables Obligations.

*Id.* at 1.

Each of the Guaranties defines Guaranty Trigger Event to include, among others:

> (iii) fraud or intentional misrepresentation by any officer, employee, agent or representative of the Borrower or its Affiliates in connection with the transactions contemplated by the Transaction Documents, or in respect of the Collateral or any Underlying Portfolio;
>
> (x) any violation by Borrower or Parent of Section 7.01(a), 7.01(u), 7.01(w), of [sic] Section 7.02 of the Credit Agreement.; and
>
> (xv) an Insolvency Event with respect to Borrower, Guarantor, the Servicer, any Senior Borrower or any of the Affiliates.

*Id.* at 1–2.

Section 9 of each of the Guaranties also provides:

> The Guarantor shall pay or reimburse all reasonable out-of-pocket costs (including reasonable attorneys' fees and legal expenses) incurred by the Lender or the Agent in connection with the protection, defense or enforcement of the Guaranty in any litigation or bankruptcy or insolvency proceedings.

*Id.* at 7.

On June 6, 2018, senior agent CIBC Bank USA f/k/a The PrivateBank and

Trust Company ("CIBC"), as administrative agent, commenced an action against Senior Borrowers, including Servicer, in the United States District Court for the Northern District of Illinois for breach of the previously referenced Senior Loan Agreement. Am. Compl. ¶ 37, Exh. E (the "CIBC Complaint"). The Senior Loan Agreement allegedly provided Senior Borrowers with a "revolving line of credit from which they could borrow money" and required them to provide certain information to the lenders, including portfolio reports, borrowing base certificates, financial reports, and information related to dividend distributions or other similar payments. *Id.* ¶¶ 41, 42. CIBC alleged that Senior Borrowers defaulted under the Senior Loan Agreement by, among other things, providing borrowing base certificates that contained false information. *Id.* ¶ 43. CIBC alleged that, based upon these allegedly materially false certificates, Senior Borrowers caused the senior lenders "to advance more than $80 [million] above the limits set forth in" the Senior Loan Agreement. *Id.* (quoting the CIBC Complaint ¶ 58). Based on this and other alleged events of default, including that Senior Borrowers "co-mingled and continued to co-mingle all cash collections with respect to" certain portfolios and "improperly and routinely use[d] any such available cash for expenses of the Borrowers regardless of source," CIBC claimed that Senior Borrowers had breached the Senior Loan Agreement. *Id.* ¶¶ 43–49 (quoting the CIBC Complaint ¶ 81).

In light of the allegations in the CIBC Complaint, on June 12, 2018, Citibank notified Borrower and Parent by letter of certain events of default— namely, the breach of the Senior Loan Agreement by Senior Borrowers, including Servicer, and their resulting insolvency, as evidenced by their inability to pay their debts as they became due—and declared the loan to be immediately due and payable. *Id.* ¶ 60. Borrower and Parent did not pay the outstanding balance due under the Credit Agreement by either the accelerated or stated maturity dates. *Id.* ¶ 62. Subsequently, on September 12, 2018, Citibank notified Defendants by letter of certain trigger events and demanded that they perform their obligations under the Guaranties. *Id.* ¶ 70. Citibank sent Borrower, Parent, Servicer, and Defendants a second demand letter on October 9, 2018, and a third demand letter on December 3, 2018. *Id.* ¶¶ 71, 72. To date, Defendants have not made any payments. *Id.* ¶¶ 73, 74.

On February 5, 2019, the court in the CIBC action entered a Stipulated Order for Immediate Appointment of Receiver, in which the court stated that it "has jurisdiction over the subject matter of the action and over the Defendants." *Id.* ¶¶ 51, 54, Exh. F (the "Receivership Order"). The property subject to the receivership included:

(a) The Collateral (as defined below);

(b) All cash, cash on hand, checks, cash equivalents, credit card receipts, demand deposit accounts, bank accounts, cash management or other financial accounts, bank or other deposits and all other cash collateral (

all whether now existing or later arising); current and past due earnings, revenues, rent, issues and profits, accounts or accounts receivable (all whether unpaid, accrued, due or to become due); and all other gross income derived with respect to the Collateral, regardless of whether earned before or after entry of this Order (collectively "Income"); all of the Defendants' interests in the following entities: JH Met Asset Entity LLC, JFI CX Asset Entity LLC, JHPDE Finance I, LLC; and

(c) All permits, licenses, other contracts, software user names and passwords, software user credentials and other intangible property pertaining to the Receivership Property and the operations of the Defendants with respect to the management, maintenance and control of the Receivership Property or the Defendants.

The "Collateral" means and includes:

All of the personal property now owned or at any time hereafter acquired by each Defendant or in which such Defendant now has, or at any time in the future may acquire any right, title or interest, including all of such Defendant's:

(a) Accounts, Certificated Securities, Chattel Paper, Commercial Tort Claims which are listed on Schedule 2.7, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Financial Assets, Fixtures, General Intangibles, Goods, Health Care Insurance Receivables, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, money (of every jurisdiction whatsoever), Payment Intangibles, Securities, Security Entitlements, Securities Accounts, Supporting Obligations, Tangible Chattel Paper and Uncertificated Securities, other than any interest of a Grantor in the Excluded Assets;

(b) All Software and computer programs;

(c) all books and records pertaining to any of the foregoing (regardless of the medium of recording or storage), together with all of such Defendant's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media; and

(d) All Proceeds (whether Cash Proceeds or Noncash Proceeds), products, offspring, rents, issues, profits and returns of and from any of the foregoing of the foregoing property, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the

> foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

See Receivership Order, Exh. A.

Dkt. No. 35, Report and Recommendation ("R&R") at 2-9.

## III. DISCUSSION

The Report and Recommendation recommends that Defendants' motion to dismiss be denied with respect to the claims for breach of contract and for attorneys' fees, and granted with respect to the unjust enrichment claim. The Court addresses each claim in turn.

### A. Breach of Contract

The Report and Recommendation addresses two arguments put forward by Defendants in support of their claim for dismissal of the breach of contract claim: (1) that Citibank failed to adequately allege two of the three identified Guaranty Trigger Events (the fraud-based and covenant-based Guaranty Trigger Events); and (2) even if triggered, Defendants' obligations under the Guarantees do not include the repayment of the loan provided for in the Credit Agreement. On the first, Judge Cott agreed that the Amended Complaint does not sufficiently allege the two trigger events. (R&R at 13-15.) But, because Defendants did not dispute the allegations with respect to the other Guaranty Trigger Events, Judge Cott nonetheless addressed the nature of the obligations triggered, which he found to include the repayment of the loan. (R&R at 15-19.)

*1. Guaranty Trigger Events*

Defendants do not challenge Judge Cott's decision with respect to the allegations relating to the Guaranty Trigger Events. Citibank's limited response to the Report and Recommendation asks the Court, should it adopt the portions of the Report and Recommendation with respect to the Guaranty Trigger Events (which, having reviewed for clear error, it now does), that it clarify that the "Court's ruling does foreclose Citibank from repleading a fraud-based triggering event and/or covenant-based triggering event in

the future." (*See* Dkt. No. 37 at 1.) Defendants do not respond to Citibank's submission. Because Rule 15, sets forth a "permissive standard" for the amendment of complaints, and because Judge Cott did not determine that amendment would be futile (nor, for that matter, does this Court), the Court will allow Citibank leave to file an amended complaint that pleads fraud-based and covenant-based Guaranty Trigger Events. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

2. *Obligations*

Turning to the obligations triggered by the Guaranty Trigger Events, Defendants urged Judge Cott to recommend that the Guaranties' use of the term Guaranteed Obligations *unambiguously does not* require Defendants to repay Borrower's loan repayment obligation. Judge Cott declined to do so, instead finding that Guaranteed Obligations *unambiguously does* include the obligation to repay Borrower's loan obligation. (R&R 17-20.) Defendants' now ask the Court to revisit this decision. (Dkt. No. 36 "Defs' Opp.")

The parties' positions have shifted slightly since the motion to dismiss briefing was submitted. In the original submissions on Defendants' motion to dismiss, Defendants, as noted above, argued that Guaranteed Obligations unambiguously supports their reading. (Dkt. Nos. 23 at 8-9, 28 at 1-6.) Citibank, on the other hand, argued primarily that the meaning of the term is ambiguous (although it noted its view that, if unambiguous, it is unambiguous in favor of its view that it includes the loan repayment obligations). (Dkt. No. 26 at 15-21.) After Judge Cott recommended that the term be found to be unambiguous in Citibank's favor, Defendants altered their position: while they still argue that the term is unambiguous in their favor, they say, if the Court does not agree, it should find the term to be ambiguous. (Defs' Opp. at 12.) Citibank no longer argues the term is ambiguous, instead arguing it is unambiguous in favor of its reading. (Dkt. No. 38 ("Pltf. Response") at 16.)

9

The Court reviews this aspect of the Report and Recommendation *de novo*.[4] At the outset, the Court notes that in order to dismiss the breach of contract claim it must find that Guaranteed Obligations is unambiguous in favor of Defendants' reading—the term does not cover Borrower's loan repayment obligation, and therefore Citibank has failed to state a claim. If instead the Court finds that the term is ambiguous, or that it unambiguously covers the repayment obligation, then the motion to dismiss the breach of contract claim must be denied.

Under New York law, "a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (quoting *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009)); *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007) ("[T]he intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms."). "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*, 98 A.D.3d 403, 406 (2012) (alteration in original) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)). Conversely, a contract is ambiguous where its language is susceptible to multiple reasonable interpretations. *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011). Ambiguity will not be found "where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'" *Seiden Assocs., Inc. v. ANC*

---

[4] Citibank argues that, because Defendants' objection to the Report and Recommendation largely recycles arguments they made previously, the Report and Recommendation should be reviewed for clear error. *See* Pltf. Response at 15-16 ("[W]here, as here, an objection to a report and recommendation 'simply reiterates the original arguments, the district court will review the report and recommendations strictly for clear error.'") (quoting *McLaughlin v. Barron*, 2020 U.S. Dist. Lexis 6241, *6 (S.D.N.Y. Jan. 9, 2020.) Among other reasons, because, as Citibank acknowledges, Defendants now argue that the Court should find that the use of the word "Limited" in the title of the Guarantees suggests a more limited scope of the guaranty provisions, something not raised earlier, the Court finds *de novo* review appropriate.

*Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (alteration in original) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)). If a contract is ambiguous, "and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such a determination is to be made by the jury." *First Mercury Ins. Co. v. 613 N.Y. Inc.*, 609 F. App'x 664, 666 (2d Cir. 2015) (summary order) (quoting *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172 (1973)).

Here, as noted above, the Guarantees each define "Guaranteed Obligations" as: "collectively, (a) all Obligations of Borrower to Lender and Agent under the Credit Agreement and other Loan Documents, and (b) all Original Receivables Obligations." (Am. Compl. Exs. C § 1, p. 1; D § 1, p. 1.) While the definition includes the word "Obligations," with a capitalized "O," the term is not defined in the Guarantees.

The Guarantees state that "[u]nless otherwise defined in this Guaranty, all defined terms used in this Guaranty shall have the meanings ascribed to such terms in the Credit Agreement." (*Id.*) The Credit Agreement, in turn defines "Obligations" as "ha[ving] the meaning assigned to such term in the Security Agreement. (Am. Compl. Ex. A, p. 10.) The Security Agreement, however, does not define the term. (*See* Dkt. No. 24, Lee Decl., Ex. 1.)

Defendants put forward a number of arguments urging their interpretation that it excludes Borrower's loan repayment obligations. They argue that the Credit Agreement defines "Secured Obligations" to include the loan repayment obligation and, therefore, if the parties had intended for Defendants to guaranty the loan repayment obligation they would have used the term "Secured Obligations." (Defs. Opp. at 8, 9.) They also argue that the Guaranties elsewhere use uncapitalized "obligations" in referring to "all obligations," suggesting, to Defendants, that "all Obligations" is narrower. (*Id.* at 9-10.) And, they argue that the title of the Guaranties—"Limited Indemnity Guaranty"—makes clear that Defendants' personal guaranties are limited in scope, and do not include the

loan repayment obligation. (Opp. at 10.) Instead, they argue, because the term "Obligation" points to the Security Agreement, the Guarantees "are promises by Defendants to fulfill the Borrower's Obligations under the Security Agreement and nothing more." (Opp. at 10-11.)

Defendants' interpretation is strained, at best. *First*, Defendants' argument rests on the distinction between "obligation" as a defined and undefined term, but none of the agreements actually define the term. *Second*, Defendants' interpretation—that Defendants simply guaranteed the Borrower's obligations under the Security Agreement—would seem to lead to an absurd result. The Security Agreement requires the Borrower, not Defendants, to provide Citibank with a security interest in its assets. But, it is unclear how, and Defendants do not explain, Defendants could guarantee Borrower's performance of this obligation (or, why the parties would have entered into such an arrangement given that the Security Agreement was entered into months before the Guarantees, which was agreed to in consideration for the parties executing an amendment to the Credit Agreement (*see* Am. Compl. ¶ 28)). And, *third*, the argument renders illogical and superfluous the reference in the Guarantees to a guarantee of "the due and punctual <u>payment</u> and performance of the Guaranteed Obligations" (*see* Exs. C § 2, p. 3; Ex. D § 2, p. 3 (emphasis added)), as well as other references to "payment", as Defendants contend the obligation does not cover any obligation of payment.

Given the above, the Court finds that Guaranteed Obligation does not unambiguously exclude the obligation to guaranty Borrower's loan repayment obligation.[5] The Court need not decide now as between whether the term is ambiguous

---

[5] The Court rejects Defendants' argument that the doctrine of *strictissimi juris* compels a different result. While the doctrine means that the liability "of a surety cannot be extended-beyond the plain and explicit language of the contract. . . a surety is not entitled to any particular tenderness in the interpretation of the language of his contract.'" *See AXA Inv. Managers UK Ltd. v. Endeavor Capital Mgmt. LLC*, 890 F. Supp. 2d 373, 385 (S.D.N.Y. 2012) (quoting *Compagnie Financiere CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 34 (2d Cir.1999) (internal quotations omitted).

or unambiguous in its inclusion of the loan repayment obligation. Defendants' motion to dismiss the breach of contract claim is DENIED.

### B. Attorneys' Fees

Defendants also ask the Court to reject Judge Cott's recommendation that Defendants' motion to dismiss Citibank's claim for attorneys' fees be denied. The Court reviews the claim *de novo*.

Citibank's claim for attorneys' fees is based on Section 9 of the Guarantees which states: "The Guarantor shall pay or reimburse all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Lender or the Agent in connection with the protection, defense or enforcement of this Guaranty in any litigation or bankruptcy or insolvency proceedings." (*See* Exs. C § 9, p. 7; D § 9, p. 7.)

Defendants argue this claim should be dismissed because, it claims, the Amended Complaint has failed to allege that Defendants breached the Guaranties. Because the Court finds that the Amended Complaint does adequately allege breach of the Guarantees, it does not dismiss the claim for attorneys' fees. And, the Court notes, as Judge Cott did, that the attorneys' fees provision in the Guaranties does not expressly limit Citibank's recovery for attorneys' fees to the event that it prevails. (*See* R&R at 20.)

Accordingly, Defendants' motion to dismiss Citibank's claim for attorneys' fees is DENIED.

### C. Unjust Enrichment

Neither party submitted challenges with respect to the portion of the Report and Recommendation addressing the unjust enrichment claim. Having reviewed that portion of the Report and Recommendation for clear error, the Court adopts Judge Cott's recommendation that the unjust enrichment claim be dismissed. Accordingly, Defendants' motion to dismiss the unjust enrichment claim is GRANTED.

## IV. CONCLUSION

For the foregoing reasons, the Report and Recommendation is ADOPTED in part and MODIFIED in part. Defendants' motion to dismiss the breach of contract and attorneys' fees claims is DENIED. Defendants' motion to dismiss the unjust enrichment claim is GRANTED. The Clerk of Court is respectfully directed to terminate the motion at Dkt. No. 22 and the entries at Dkt Nos. 36 and 37.[6]

It is SO ORDERED.

Dated: March 30, 2020
       New York, New York

EDGARDO RAMOS, U.S.D.J.

---

[6] Defendants' request for oral argument at Dkt. No. 36 is DENIED as moot.